

June 3, 2020

**VIA ECF**
The Honorable Paul A. Engelmayer
United States District Court, Southern District of New York
40 Foley Square
New York, NY 10007

Re: *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481-PAE

Dear Judge Engelmayer:

We write on behalf of Glencore International AG ("GIAG") and Access World Vlissingen B.V. ("AW") in response to plaintiffs' letter of May 29 (ECF 1252). The Court has asked for a plan for "***limited additional discovery*** relating to GIAG and [AW]." (Fujifilm Dkt., ECF 182, at 32) (emphasis added). Instead, plaintiffs seek to conduct extensive documentary, testimonial, and data discovery as if the case was just beginning, and as if plaintiffs did not already have the benefit of the dozens of depositions and millions of documents produced by the defendants, their affiliates, and multiple third parties since the inception of the *Aluminum* cases in 2013. In contrast, defendants propose a robust discovery plan that would address plaintiffs' every legitimate discovery need, without the wasteful exercise of requiring defendants to review many thousands of irrelevant emails, and to produce internal emails that contain sensitive third-party business information, neither of which would develop the record concerning plaintiffs' allegations. (*See* Ex. A.)

The complaints include just two sets of allegations that name GIAG or AW. These allegations concern: (1) GIAG's 2010 communications with Metro regarding aluminum in Detroit, and (2) a 2011 swap transaction between GIAG and JPMorgan involving aluminum in Detroit and Vlissingen. (Fujifilm Dkt., ECF 35, ¶¶ 212, 216, 231-34, 240-41; Reynolds/SW Dkt., ECF 99, ¶¶ 107-10, 130.) These limited allegations about specific transactions between April 1, 2010 and December 31, 2011 (the "Relevant Period") are the only pleaded facts about GIAG or AW.

Notwithstanding the enormous existing discovery record, which includes the deposition of AW's Simon Yntema[1] and voluminous produced communications involving GIAG and AW, and despite the narrow factual allegations against GIAG and AW, plaintiffs demand data reflecting GIAG's worldwide aluminum holdings, and purchase and sale data with all non-parties throughout most of the world, over a five-year period (2010-14). The vast majority of this data (involving activities in venues unconnected to this case, such as Australia and Africa) has no relevance. Yet, during the negotiations, defendants *provisionally* offered to accede to these demands, subject to reaching a comprehensive agreement. With no such agreement having been reached, defendants propose to produce, for the Relevant Period, data *relevant to this case*: (i) AW's warehouse holdings and storage agreements; and (ii) GIAG's aluminum holdings in

---

[1] Yntema's deposition included extensive questioning about—among other issues of interest to plaintiffs—the queues in Detroit and Vlissingen, AW's communications with JPMorgan and Metro, the 2011 Vlissingen swap, and "queue building."

Detroit and Vlissingen in both LME and non-LME warehouses.  This data will reflect any alleged "queue building" activity.

Defendants also propose to make available for deposition GIAG aluminum trader Robin Scheiner, both in his individual capacity and as a Rule 30(b)(6) witness, using the Rule 30(b)(6) deposition topics requested by plaintiffs.  (Ex. A.)  These topics include: GIAG's communications with affiliates about the 2011 swap with JPMorgan (No. 2); GIAG's communications with affiliates "regarding any attempt to create warehouse load-out queues, bottlenecks, choke points, or efforts to build a critical mass of metal in a warehouse" (No. 5); and discussions concerning alleged plans to build queues in Vlissingen and Rotterdam (Nos. 9 and 12).  Plaintiffs can also question Mr. Scheiner in his individual capacity.

In addition, GIAG and AW propose to search for and produce, for the Relevant Period—using the keywords requested by plaintiffs—two types of potentially relevant communications: (i) all communications with *Aluminum* co-defendants or with additional relevant non-parties identified by plaintiffs[2] (together with the co-defendants, the "Identified Parties"); and (ii) all internal communications *referring to* communications with the Identified Parties.  These searches (collectively, the "Relevance Filters") will capture any allegedly conspiratorial communications, as well as any internal references to such communications.  Moreover, defendants have offered to expand the Relevance Filters if plaintiffs propose additional filters aimed at catching emails that relate to the case.

This extensive package should more than comply with the Court's directive for "limited additional discovery." And Scheiner's testimony, together with the documents and data defendants propose to produce, would readily satisfy plaintiffs' discovery needs.

Plaintiffs, however, demand even more. They seek internal communications that do not refer to any communication with Identified Parties, but that merely include common words such as, for example, "queue" or "premium" in conjunction with other common words such as "Detroit" or "Vlissingen."  These and plaintiffs' other proposed search terms were in everyday usage; and emails that contain such terms, not tied to any communication with Identified Parties, are not relevant, may contain unrelated sensitive business information, and would be unduly burdensome to review.  As the existence of queues is not in dispute, emails that merely refer to queues are not relevant to any disputed issue, and are at best cumulative to  the relevant email communications defendants offer to produce.  Defendants proposed the Relevance Filters in an effort to identify emails that could shed light on plaintiffs' allegations.  Defendants' proposal should capture all relevant emails.  Defendants have entreated plaintiffs to request additional relevance filters.  For example, when plaintiffs proposed including communications with Red Kite, Deutsche Bank, Burgess-Allen, and Steinweg, defendants agreed and invited plaintiffs to add other entities to the list.  But plaintiffs have not suggested any additional relevance filters— instead insisting that any emails that contain their keywords should be produced, irrespective of wastefulness or third-party business sensitivity.

Plaintiffs must show that the discovery they seek is "relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1).  Plaintiffs have not met their burden.  In *ipse dixit* fashion, plaintiffs

---

[2] Red Kite (RK), Deutsche Bank, Burgess-Allen, and Steinweg.

assert that any internal email mentioning these terms is somehow "critical to understanding GIAG's strategy and participation in queue building and premium-inflating conduct." (ECF 1252 at 1.) That conclusory assertion is not only unsupported, but demonstrably incorrect. For example, Reynolds' and Southwire's own internal emails use these very terms, with no conspiratorial connotation. (*See*, *e.g.*, Ex. B.)

Plaintiffs turn their burden upside down, contending that the *defendants* bear the burden of showing that "each discovery request is not relevant" or is otherwise oppressive. (ECF 1252 at 2.) That is not so. "Plaintiffs, as the parties seeking discovery . . . bear the initial burden of proving that the information and documents sought are relevant and proportional to the needs of the case." *Citizens Union of N.Y. v. Atty. Gen.*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).

Plaintiffs distort the negotiation record, and claim the parties have reached agreement on all but one issue. That is not true. From the inception of negotiations, defendants expressly stated that they "are aiming for a complete agreement on discovery parameters, rather than binding each side by a partial agreement-in-principle where remaining issues of importance are unresolved." (Ex. C) (May 10, 2020 12:39 pm email). Defendants later reiterated their reservation of rights. (Ex. D) (May 15, 2020 12:34 pm email). *At no time did plaintiffs demur or disagree*. In a good-faith effort to resolve the dispute, defendants made increasingly generous *provisional* proposals for resolution.

Throughout the negotiations, defendants stated unequivocally that, while they would produce emails with the Identified Parties, as well as internal emails concerning communications with the Identified Parties, they would not produce other internal communications that referred to queues or premiums. Defendants explained that these were commonly used terms that shed no light on the issues, and that searches conducted without a suitable relevance filter would likely capture irrelevant communications that implicated sensitive third-party business information.

On May 18, plaintiffs sent a revised search proposal. (Ex. E) (May 18, 2020 8:37 am email and attachment). The proposal conceded in most respects that, as defendants had insisted, searches should be restricted pursuant to the Relevance Filters. (*Id.*, items (1), (2), and (3)). However, the proposal added: "(4) internal GIAG or AW Vlissingen emails *relating to queues at Detroit or Vlissingen.*" (*Id.*) (emphasis added). By its terms, item (4) was not subject to the Relevance Filters. That same day, defendants wrote back, "We cannot agree to produce all internal communications referring in passing to the queues." (Ex. F) (May 18, 2020 1:44 pm email). Nevertheless, defendants searched for emails pursuant to item (4). For just one custodian at AW (Yntema), without counting any documents of GIAG custodians Scheiner or Gary Fegel, the search yielded nearly 38,000 hits. This number alone, even without other custodians' emails, is far too many to be reviewed efficiently. Indeed, in the earlier negotiation involving defendants' efforts to take discovery, Reynolds and Southwire took the position that even 15,000 hits were too burdensome. (Ex. G.)

Plaintiffs complain that defendants ran the search described in item (4), which resulted in a high hit count, and did not do keyword searches. But from the start, defendants explained that they were prepared to produce documents generated by the keyword searches, so long as these were filtered for relevance. When plaintiffs proposed item (4)—internal emails "relating to queues at Detroit or Vlissingen"—AW searched for such emails and reported about 38,000 hits. Plaintiffs complain that the 38,000 figure is inflated because Yntema used a signature block containing the word "Vlissingen." This ignores that, at all relevant times, Yntema was based in Vlissingen and managed the AW warehouse in Vlissingen, and emails to or from Yntema (some of which had

been produced years ago) typically refer to "our queue" or "the queue."  (*See* Ex. H.)  Yntema did not generally use the word "Vlissingen" in connection with the queue.  The search run by defendants  presumptively yielded all of his emails that mention the queue in Vlissingen.

Defendants' discovery plan is a substantial package.  (Ex. A.)  With the production of significant data, relevant communications, and individual and Rule 30(b)(6) depositions on plaintiffs' chosen topics, plaintiffs will have ample opportunity to discover any facts relevant to the issues in this case.  Plaintiffs have not shown that their proposal will yield additional relevant information.  It will not.  Nor have plaintiffs offered any expansion of defendants' proposed Relevance Filters.  Plaintiffs prefer their unfiltered searches, which would capture irrelevant third-party business information and routine offhand mentions of the queues.  By contrast, Defendants' proposal is tailored to the Court's directive of "limited additional discovery" and the voluminous record already available to the parties.  The Court should adopt defendants' discovery plan.

Respectfully submitted,

/s/ Eliot Lauer
Eliot Lauer